UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAO GROUP, INCORPORATED,

                    Plaintiff and counter-defendant,        Case Number 09-11354

v.                                                Honorable David M. Lawson

FEDERAL-MOGUL CORPORATION,

                    Defendant and counter-plaintiff.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS TO PRECLUDE TESTIMONY OF JEFFREY VIOLA AND FRED G. HENDERSHOT

This matter is before the Court on two motions filed by the defendant to prevent the plaintiff from calling at trial two expert witnesses. The core dispute arises from a contract to supply automotive parts that eventually were installed in Chrysler products. The parts are interior lighting assemblies that were manufactured by the plaintiff, Cao Group, Inc., according to the design furnished by the defendant, Federal-Mogul Corporation. There does not appear to be much of a dispute that the parts were defective: the lights would not illuminate consistently when the push-button switch was depressed. The defendant, who refuses to pay for the parts, contends the faulty products result from defective manufacturing. The plaintiff, suing to collect its invoices, contends that it manufactured the parts exactly according to the defendant's design, and a design defect is the cause of the problem. The plaintiff intends to call as witnesses Jeffrey Viola, a physicist, and Fred G. Hendershot, an automotive business manager.

The defendant bases its motions on two grounds: the disclosures required by Federal Rule of Civil Procedure 26(a)(2) were untimely, and the purported opinion testimony of the witnesses will not meet the requirements of Federal Rule of Evidence 702. The Court heard oral argument on the

motions on September 21, 2010.  The parties sought and were granted leave to file supplemental briefs.  The Court now finds that neither witness should be prevented from testifying, but their testimony must be limited to opinions that are helpful to the fact finder and supported by the research and testing they actually performed.  Therefore, the motions will be granted in part and denied in part.

## I.

The parties refer to the subject of the supply contract part as a POD LED lighting assembly (Pod assembly).  It appears to be intended as an interior dome light that illuminates when the outer lens is pushed, and then deactivates when it is pushed again.  Depressing the lens causes a thin metal stamping held in tension to extend and make contact with energized pads, causing the light-emitting diode to illuminate.  A second push causes the stamping to retract from the pads, deactivating the light.

The parties entered into a supply contract on July 31, 2006 under which Cao agreed to manufacture and Federal-Mogul agreed to purchase Pod assemblies.  On August 28, 2006, Federal-Mogul issued an award letter to the plaintiff that identified the products that Cao would supply. During contract performance, Federal-Mogul changed the specifications for the product.  Those changes allegedly led to quality issues, delays, and additional costs to both parties, for which Cao denies responsibility.  Federal-Mogul also required Cao to source its parts from certain vendors, leading to quality issues, delays, and costs for which Cao refuses responsibility.

During performance of the contract, Federal-Mogul paid less than the full amount owing on the invoices, claiming set-offs because delivered Pod assemblies did not meet Federal-Mogul's specifications.  In June 2008, Cao and Federal-Mogul communicated in order to formulate a contract

exit strategy.  On August 27, 2008, Federal-Mogul sent payment of $113,300 to Cao, but cancelled payment the next day.  Federal-Mogul has not made any further payments to Cao.  On September 5, 2008, Federal-Mogul informed Cao that it was exercising its rights of set-off and recoupment against an additional $624,844.23 of the outstanding amounts owed to Cao.  Cao brought suit for breach of contract, account stated, breach of implied covenant of good faith and fair dealing, unjust enrichment, and declaratory relief.  Federal-Mogul brought a counterclaim that included claims of breach of contract and breach of implied warranty and duty of good faith.

The Court entered a scheduling order on September 1, 2009 that required the plaintiff and counter-plaintiff to serve expert reports under Federal Rule of Civil procedure 26(a)(2) by March 29, 2010.  Cao filed a motion to extend that date, which the defendant opposed, and the Court entered an order on April 27, 2010 extending Cao's disclosure date to May 4, 2010.  Federal-Mogul filed the present motions on July 12, 2010.

According to the reports furnished and depositions taken in the matter, Jeffrey Viola will be called as an expert witness by the plaintiff to support its contention that the product failure was due to a design defect by testifying that (1) the Pod assembly was not ready for production at the time of release; (2) the defendant poorly handled the design for assembly concerns; (3) the design was defective from the start; and (4) the defendant's design flaws, not manufacturing problems, were the ultimate cause of the Pod assembly problems.  Federal-Mogul argues that Mr. Viola's testimony should be precluded because it is unreliable and does not satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702.  The defendant argues that Mr. Viola's methodology is unreliable because his analysis is based entirely on his review of what others stated about the design and its manufacturability and his "finger test,"

in which he applied pressure to the metal spring with his finger.  Federal-Mogul cites several other criticisms of Mr. Viola's examinations of the product.

Fred Hendershot is expected to testify about industry standards relating to design changes and dealings with sub-suppliers.  His report contains opinions that Cao cannot be responsible for defective parts because Federal-Mogul dictated the source Cao could use for parts or subassemblies; Federal-Mogul did not use the proper channels of communication for design changes; there were better designs available, which Federal-Mogul did not choose because of costs; and Federal-Mogul should not collect rework charges because it did not follow industry standards.  The defendant argues that Mr. Hendershot's testimony is irrelevant and unreliable, and the jury can decide the issues without expert assistance.  In addition, the defendant believes that some of Mr. Hendershot's opinions relate to questions of law, which are exclusively within the province of the court.

Federal-Mogul argues that both witnesses should be precluded from testifying because the plaintiff did not furnish reports under Federal Rule of Civil Procedure 26(a)(2) by the first deadline set by the Court.

## II.

Expert reports are governed by Federal Rule of Civil Procedure 26(a)(2).  The reports must be exchanged on time, and they must contain the items listed in rule 26(a)(2)(B).  The failure to serve a report timely or furnish a complete report may constitute grounds to strike the report under Rule 37(c).  *See Phillips v. Cohen*, 400 F.3d 388, 402 (6th Cir. 2005).  Moreover, Rule 37(c)(1) authorizes the district court to exclude from a trial information that was withheld, in violation of Rule 26(a) or (e) without "substantial justification," unless the failure to disclose was "harmless."  In fact, the language of Rule 37 suggests that exclusion is mandatory in these circumstances.  *See*

-4-

*Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004) (citing *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)); *see also Samos Imex Corp. v. Nextel Commc'ns., Inc.*, 194 F.3d 301, 305 (1st Cir. 1999) (explaining that "as amended, the civil procedure rules make clear that exclusion of evidence [such as an expert's testimony] is a standard sanction for a violation of the duty of disclosure under Rule 26(a)").

In this case, the plaintiff did not furnish its expert reports under Rule 26(a)(2) by the initial deadline, but it sought and obtained (over the defendant's objections) an enlargement of time. The reports were served within the expanded deadline. The defendant argues that the Court should ignore the time enlargement because the facts do not support the plaintiff's initial reasons for seeking the extension. The defendant, in effect, is asking for reconsideration of the contested motion for enlargement of time.

Motions for reconsideration may be granted when the moving party shows (1) a "palpable defect," (2) that misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case. E.D. Mich. LR 7.1(h)(3). A "palpable defect" is a defect which is obvious, clear, unmistakable, manifest, or plain. *Mich. Dep't of Treasury v. Michalec*, 181 F. Supp. 2d 731, 734 (E.D. Mich. 2002) (citations omitted). The Local Rules provide that "[g]enerally . . . the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication." E.D. Mich. LR 7.1(h)(3). A motion for reconsideration must be filed within fourteen days of the entry of the order from which reconsideration is sought. E.D. Mich. LR 7.1(h)(1).

To the extent that the defendant's motion asks the Court to ignore or set aside it's previous order enlarging time for expert reports, the motion is untimely. It was filed several months after the

enlargement order, which was entered in April 2010. Moreover, the argument merely rehashes the debate over the plaintiff's justifications for seeking more time.

The defendant's second argument challenges the substantive admissibility of the expert testimony itself. Any challenge to expert testimony must begin with Rule 702 of the Federal Rules of Evidence, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The language added by the amendment to Rule 702 restates *Daubert*'s insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses. *See Daubert*, 509 U.S. at 591-93.

In addition, expert testimony is not admissible unless it will be helpful to the fact finder. Such testimony is unhelpful when it is unreliable or irrelevant, as the Court observed in *Daubert*, *see id.* at 591-92, and also when it merely deals with a proposition that is not beyond the ken of common knowledge, *see, e.g., Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) ("If everyone knows this, then we do not need an expert because the testimony will not 'assist the trier

of fact to understand the evidence or to determine a fact in issue.'") (quoting Fed. R. Evid. 702). Finally, before an expert may give an opinion, the witness must be qualified to do so. *See id.* at 1348-50; *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998). The proponent of expert testimony must establish all the foundational elements of admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

An opinion is "reliable" from an evidentiary standpoint if it is "valid" according to the discipline upon which it is based. *See Daubert*, 509 U.S. at 590. In determining validity, the Court's focus is on principles and methodology, not results. And there is no precise formula by which a court might deem a methodology "acceptable" or "unacceptable." *Daubert* and its progeny have therefore not created a "straitjacket," *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001), but rather counsel a flexible approach, reconciling the "liberal thrust" of Rule 702 which "relax[es] the traditional barriers to opinion testimony" with the responsibility to "screen[ ] such evidence" in order to keep unreliable or invalid opinions from the jury. *Daubert*, 509 U.S. at 588-89; *see also Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000).

### A. Jeffrey Viola

Jeffrey Viola is trained as a physicist. The defendant has not challenged Mr. Viola's qualification as an expert — his education, work experience, and training certainly pass muster. Mr. Viola graduated from Oakland University in 1990 with a bachelor of science degree in physics and from the University of Michigan in 1994 with a master of science degree in physics. He considers himself an expert in physics; electro-mechanical designs; engineering, specifically the development

-7-

of materials for switches; molding operations, i.e., injection and plastic molding, casting, and stampings; and magnetics.

From 1990 to 1997, Mr. Viola worked as a research associate for the University of Michigan's Nuclear Medicine Department.  There he built, designed, and assembled equipment to measure and perform chemical reactions used in Positron Emission Tomography imaging technology.  Mr. Viola worked at Ford Motor Company from 1997 to 2004 in its Advanced Sensors Group, where he identified and developed technologies that might be considered in future products. While at Ford, Mr. Viola worked on inverter systems for electric vehicle drive, torque sensing for assisted steering, engine speed sensing, and throttle position sensing.  Mr. Viola currently is employed at Allegro Microsystems as a field applications engineer; it entails helping Allegro customers develop products for sensing switch, latch, position, speed, and current.  Mr. Viola also works part-time as a consultant.  He has never worked for a thin metal stamping firm or designed a progressive die used in connection with the metal stamping.

In preparation for his opinions in this case, Mr. Viola reviewed one finished Pod assembly and one circuit board assembly (collectively, the Samples), but he didn't know who made them — Broadway or Interplex — or when they were made.  His review of the Pod assembly consisted of visually inspecting the device; applying an unknown amount of finger pressure to the spring; actuating the on/off switch; and analyzing the contact points, the flexibility of the spring, the alignment, and applied forces to the device to see how far it would travel outside the contact points. He did not measure or document the relationship between the force applied and the movement of the end of the spring relative to the contact pads.  He did not perform any analysis to determine the metallurgical composition of the pads or whether there was any contamination of the circuit board

-8-

or the pads in the Samples. He did not know if the stampings in the Samples were within specification, and he did not know if the Pod assembly would illuminate if connected to a power source. Mr. Viola did not run any computer programs to analyze any aspect of the Pod LED assembly. He did not do any analysis evaluating the manufacturability of the stamping used for the spring, nor was he familiar with the specifics of the manufacturing process used by Broadway or Interplex to make the stamping. He did not do any durability analysis.

As noted earlier, the defendant's breach of warranty claim hinges on whether a defective design or manufacturing problems caused the Pod assemblies to fail. The defendant asserts that its own testing of failed parts shows that the root cause of the failures was solder flux residue contamination from the manufacturing process. The defendant challenges the sufficiency and reliability of Mr. Viola's opinions based on the fact that Mr. Viola did not produce any technical data or take any dimensional measurements in preparing his report, conduct every conceivable test, or know who made the Pod assembly he inspected. Mr. Viola's methods were not exhaustive, but his examination, combined with his document review, provided enough information for him to form an opinion on the design's deficiencies.

Mr. Viola's testimony is relevant. The design concerns at issue are beyond the knowledge of lay persons, and Mr. Viola's testimony will help the trier of fact understand the science of switch design.

However, when it comes to the opinion that the design flaws, rather than manufacturing flaws, were the cause of the parts failures, Mr. Viola has not gathered adequate data to support his views. He never examined any failed parts. It does not appear that he ever investigated the manufacturing processes of the two sub-suppliers. He has not performed any tests on any Pod

-9-

assemblies delivered to the defendant to determine the cause of their failure.  Although Mr. Viola is qualified to criticize the design of the product, his opinion that design flaws and not manufacturing flaws caused the part failures amounts to no more than speculation.  "'[N]o matter how good' experts' 'credentials' may be, they are 'not permitted to speculate.'"  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000)).  "The '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion."  *Ibid.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Mr. Viola may comment on the design features of the Pod assemblies, but he may not offer any testimony opining that a design defect, and not manufacturing problems, caused the Pod assemblies in question to malfunction.

### B.  Fred G. Hendershot

As with Mr. Viola, the defendant does not challenge Mr. Hendershot's qualification as an expert.  Mr. Hendershot graduated from Macomb County Community College in 1972 with an associate's degree in civil hydraulic engineering, and from Michigan State University in 1976 with a bachelor's degree in business management and a master's degree in finance.  Mr. Hendershot received certification as a QS9000 Internal Auditor from the Automotive Industry Action Group in 1998.  In 2000, Mr. Hendershot earned a master's degree in international business from Lawrence Technical University.  Mr. Hendershot worked for thirteen years as the commercial and commodities manager for sensors and switches for Ford Motor Company.  He is qualified by experience to testify about industry practices in this area of parts procurement.

 Mr. Hendershot's testimony is relevant because his knowledge of industry standards may help the trier of fact understand the issues.  Although the defendant believes that Mr. Hendershot's

testimony should be precluded because a jury would be capable of deciding the case without his testimony, the Court is satisfied that a lay person is not familiar with the standards of the automotive industry. To the extent that such knowledge would help the factfinder decide the case, his testimony could be relevant.

The defendant is correct that it would be improper to allow Mr. Hendershot to comment on either party's obligations under the Supply Agreement or the Uniform Commercial Code. *Sheet Metal Workers, Int'l Ass'n, Local Union No. 24 v. Architectural Metal Works, Inc.*, 259 F.3d 418, 424 n.4 (6th Cir. 2001) ("The construction of unambiguous contract terms is strictly a judicial function."); *Berry*, 25 F.3d at 1353 (finding that expert testimony that made legal conclusions was improper). Mr. Hendershot, however, will be allowed to testify regarding the meaning of specialized contract terms in order to assist the factfinder in interpreting each party's anticipated obligations, if the other facts present a contextual dispute on those points. *Transpro, Inc. v. Leggett & Platt, Inc.*, 297 Fed. App'x 434, 442 (6th Cir. 2008) (citing *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) (finding expert testimony properly admitted to interpret contract provisions having a specialized meaning in the railroad industry)).

It is difficult to assess relevancy, however, without the benefit of context. Therefore, the Court will deny the motion to preclude Mr. Herndershot's testimony in full and permit the defendant to interpose an appropriate objection at trial.

However, Mr. Hendershot will not be allowed to testify that the defendant knew of the current product's design weakness but, due to cost concerns, stayed with the design (the third conclusion in his report). Mr. Hendershot has not established any special knowledge as an engineer competent in design or manufacturing. Morever, the jury is capable of reaching its own conclusion

-11-

after reviewing the same documents Mr. Hendershot relied on to form his opinion.  Therefore, Mr. Hendershot will not be allowed to comment on any decision the defendant made regarding the Pod assembly's design.

III.

The defendant has not shown that either witness's testimony should be excluded in full.  The Court will limit the testimony of the witnesses as described above.

Accordingly, it is **ORDERED** that the defendant's motion to preclude Jeffrey Viola from testifying at trial [dkt #65] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Jeffrey Viola may not testify as to the cause of the malfunction of the Pod assemblies in question.

It is further **ORDERED** that the defendant's motion to preclude Fred G. Hendershot from testifying at trial [dkt #66] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Fred G. Hendershot may not testify to either party's duties under the Supply Agreement or the Uniform Commercial Code, draw any legal conclusions regarding liability, or testify that the defendant knew of the current product's design weakness but, due to cost concerns, stayed with the design.

It is further **ORDERED** that counsel for the parties appear before the Court on **March 21, 2011 at 10:00 a.m.** to discuss further case management deadlines and schedule the matter for trial.

s/David M. Lawson_____
DAVID M. LAWSON
United States District Judge

Dated:  March 10, 2011

-12-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 10, 2011.

s/Deborah R. Tofil
DEBORAH R. TOFIL